2022R00250/KMR

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Esther Salas |
| | : | |
| | : | Crim. No. 23- 1075 |
| v. | : | |
| | : | Count 1 |
| | : | 18 U.S.C. § 371 |
| NICCO ROMANOWSKI | : | (Conspiracy to Violate the Anti-Kickback Statute) |
| | : | |
| | : | Count 2 |
| | : | 18 U.S.C. § 1349 |
| | : | (Conspiracy to Commit Health Care Fraud) |

## **I N F O R M A T I O N**

The defendant having waived in open court prosecution by Indictment, the Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515, charges:

## COUNT 1
### (Conspiracy to Violate the Anti-Kickback Statute)

### Overview of the Conspiracy

1. From at least as early as in or around June 2017 through in or around May 2019, Defendant NICCO ROMANOWSKI and others worked together with durable medical equipment suppliers, telemedicine companies, and doctors to unlawfully profit by submitting and causing to be submitted false and fraudulent claims to federal health care benefit programs based on a circular scheme of kickbacks and bribes paid to, and solicited and received from, each other and others.

2.     In total, defendant ROMANOWSKI and other conspirators caused the submission of false and fraudulent claims to health care benefit programs totaling in excess of $127 million for durable medical equipment ("DME"). Those claims were ineligible for federal health care benefit program reimbursement, in part, because they were procured through fraud and through the payment of kickbacks and bribes.

### The Defendant and Other Individuals and Entities

3.     Unless otherwise indicated, at all times relevant to this Information:

   a.    ROMANOWSKI was a resident of Long Branch, New Jersey.

   b.    Empire Pain Center Holdings LLC was a company located in Eatontown, New Jersey operated by ROMANOWSKI and Co-Conspirator 1, who is not charged in this Information.

   c.    RediDoc LLC was a company located in Phoenix, Arizona. RediDoc was a purported telemedicine company doing business throughout the United States, and was owned and operated by Stephen Luke and David Laughlin, two co-conspirators not charged in this Information.

### Medicare and TRICARE

   d.    Medicare was a federally funded program established to provide medical insurance benefits for individuals aged 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who received benefits under Medicare were referred to as "Medicare beneficiaries."

   e.    Medicare was divided into four parts: hospital insurance (Part A); medical insurance (Part B); Medicare Advantage (Part C); and prescription drug

benefits (Part D). Medicare Part B covered non-institutional care that included physician services and supplies, such as DME, that were needed to diagnose or treat medical conditions that met accepted standards of practice.

    f. TRICARE was a federal health care benefit program for the United States Department of Defense (DoD) Military Health System that provided health insurance coverage for DoD beneficiaries worldwide, including active-duty military service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, oversaw and administered TRICARE.

    g. Both Medicare and TRICARE were "health care benefit programs" that affected commerce as defined in 18 U.S.C. § 24(b) and "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f). "Beneficiaries" were individuals covered by these programs.

    h. For a DME supplier to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

    i. As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier had to meet certain standards to obtain and retain billing privileges with Medicare, such as, but not limited to, the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable

Medicare laws, regulations, and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

    j. Medicare-authorized suppliers of health care services, such as DMEPOS suppliers, could submit claims to Medicare only for reasonable and necessary medical services. Medicare would not reimburse claims for items or services that it knew were procured through kickbacks or bribes. Medicare would not reimburse for items or services that were medically unnecessary or not provided as represented. By implementing these restrictions, Medicare aimed to preserve its resources, which were largely funded by United States taxpayers, for elderly and other qualifying beneficiaries who had a genuine need for medical services.

### **Telemedicine**

    k. "Telemedicine" refers to the practice of medicine by doctors using telecommunications technology, such as video or telephone, to connect with patients. Telemedicine companies, like RediDoc, hired doctors and other health care providers, purportedly to furnish telemedicine services to patients.

## The Conspiracy

4. From in or around June 2017 through in or around May 2019, in the District of New Jersey and elsewhere, defendant

### NICCO ROMANOWSKI

knowingly and intentionally conspired and agreed with Co-Conspirator 1, Luke, Laughlin, and others known and unknown, to commit certain offenses against the United States, namely:

(a) to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, the referral of doctor's orders for DME, for which payment may be made in whole and in part under a federal health care program, namely, Medicare and TRICARE, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

(b) to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, to telemedicine companies in return for signed doctor's orders for DME, for which payment may be made in whole and in part under a federal health care program, namely, Medicare and TRICARE, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

## Goal of the Conspiracy

5. The goal of the conspiracy was for ROMANOWSKI and his co-conspirators to unlawfully profit by receiving kickbacks and bribes from DME suppliers, in exchange for steering doctors' orders for DME to the DME suppliers with which they had agreements. ROMANOWSKI and others then paid kickbacks and bribes to telemedicine companies, including RediDoc, which the telemedicine companies in turn paid to doctors so that the doctors would sign the DME orders. The DME suppliers then submitted claims to federal health care benefit programs for which they received lucrative reimbursements.

## Manner and Means of the Conspiracy

6. It was part of the conspiracy that:

   a. ROMANOWSKI and Co-Conspirator 1, acting through Empire, identified Beneficiaries to target for DME. ROMANOWSKI and Co-Conspirator 1 purchased data, referred to as "leads," from various sources, including overseas call centers. The information included personal information about Medicare beneficiaries including their name, phone number, date of birth, and Medicare Identification number.

   b. After identifying leads, Empire employees acting at ROMANOWSKI's direction called the Beneficiaries to pressure them to agree to accept DME—frequently consisting of back, shoulder, and knee braces—regardless of medically necessity. Empire recorded the calls and later edited the recordings.

    c. Empire then transmitted to RediDoc, and other telemedicine companies, the Beneficiaries' medical information and the edited telephone call recordings. Empire paid RediDoc a kickback for each Beneficiary that RediDoc referred to a DME supplier for an order for DME.

    d. Luke and Laughlin, through RediDoc, in turn paid doctors and other health care providers to approve the pre-written doctor's orders that they had received from Empire. RediDoc paid the doctors on a per-patient basis based on how many Beneficiary "consultations" the doctors did. Typically, the amount paid to the doctors ranged from approximately $20 to $30 per "consultation." The doctors often approved the orders without having had any contact with the Beneficiary and without making a *bona fide* assessment that DME was medically necessary.

    e. ROMANOWSKI and Co-Conspirator 1 knew that the RediDoc doctors often did not contact patients or legitimately assess their need for DME. Nevertheless, RediDoc secured thousands of doctor's orders for Empire from its doctors, who were located in dozens of states around the country, including New Jersey, and for which RediDoc paid the doctors several million dollars in total. After securing signed doctor's orders, Luke and Laughlin, through RediDoc, steered the orders to DME suppliers around the country at the direction of Co-Conspirator 1 and ROMANOWSKI. ROMANOWSKI and Co-Conspirator 1 directed orders for patients from all over the country to specific DME suppliers with whom Empire had kickback arrangements. Empire had kickback arrangements with numerous DME suppliers across the country, including in New Jersey.

    f.  The DME suppliers then dispensed the DME, and submitted claims for reimbursement to health care benefit programs. Once the DME suppliers received reimbursement, they sent a portion of the proceeds to Empire as payment for the doctors' orders that ROMANOWSKI, Co-Conspirator 1, and Empire had paid RediDoc to generate.

    g.  During the conspiracy, Co-Conspirator 1 arranged to pay RediDoc, from the Empire bank account, at least approximately $6.2 million in kickback and bribe payments for DME orders that RediDoc facilitated through its paid doctors.

    h.  In total, Empire received kickbacks and bribes totaling more than approximately $63 million from DME suppliers in exchange for the referrals. Using proceeds from the scheme, ROMANOWSKI and Co-Conspirator 1 purchased luxury vehicles, including a Ferrari, a Lamborghini, and a BMW.

### Overt Acts

  7.  In furtherance of the conspiracy and to achieve its illegal objectives, ROMANOWSKI and others committed, and caused to be committed, the following overt acts in the District of New Jersey and elsewhere:

    a.  On or about the approximate dates below in August 2018, ROMANOWSKI and Co-Conspirator 1, through Empire, received five payments totaling approximately $187,285, from DME Supplier 1, each of which represented a kickback to Empire from DME Supplier 1 in return for Empire directing doctor's orders to DME Supplier 1:

8

| Date | Amount |
|---|---|
| 8/3/2018 | $47,270 |
| 8/10/2018 | $36,695 |
| 8/10/2018 | $35,440 |
| 8/20/2018 | $24,025 |
| 8/20/2018 | $43,855 |

b.  On or about the approximate dates listed below in March 2019, Co-Conspirator 1, through Empire, sent RediDoc ten payments totaling approximately $700,000, each of which represented a bribe and kickback to RediDoc for signed doctor's orders for DME:

| Date | Amount |
|---|---|
| 3/5/2019 | $100,000 |
| 3/7/2019 | $50,000 |
| 3/11/2019 | $50,000 |
| 3/11/2019 | $50,000 |
| 3/14/2019 | $50,000 |
| 3/15/2019 | $50,000 |
| 3/18/2019 | $100,000 |
| 3/21/2019 | $50,000 |
| 3/25/2019 | $100,000 |
| 3/28/2019 | $100,000 |

In violation of Title 18, United States Code, Section 371.

## COUNT 2
### (Conspiracy to Commit Health Care Fraud)

8. The allegations contained in paragraphs 1-3 and 5-7 of Count 1 are realleged here.

9. From in or around June 2017 through in or around May 2019, in the District of New Jersey and elsewhere, defendant

### NICCO ROMANOWSKI

knowingly and intentionally conspired and agreed with others to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs, including Medicare and TRICARE, which were health care benefit programs as defined under 18 U.S.C. § 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

### Goal of the Conspiracy

10. The goal of the conspiracy was for ROMANOWSKI and his co-conspirators to profit by defrauding health care benefit programs by causing them to pay for expensive medical equipment regardless of medical necessity.

**Manner and Means of the Conspiracy**

11. It was part of the conspiracy that:

a. ROMANOWSKI, Co-Conspirator 1, and others generated doctor's orders for DME regardless of medical necessity to be approved by doctors being paid kickbacks by RediDoc. At ROMANOWSKI's and Co-Conspirator 1's direction, Empire purchased lists of Beneficiaries and then called and pressured the Beneficiaries to accept DME, regardless of medical necessity. Empire recorded the calls and later edited the recordings.

b. ROMANOWSKI and Co-Conspirator 1 paid Empire's call center employees commissions, bonuses, and incentives to encourage them to convince as many Beneficiaries as possible to accept DME.  For example, ROMANOWSKI and Co-Conspirator 1 incentivized Empire's employees to pressure patients to accept as many braces as possible, regardless of medical necessity. Empire employees, acting on ROMANOWSKI's and Co-Conspirator 1's instructions, also sought to persuade Beneficiaries to accept primary braces, i.e., back, shoulder, and knee braces, as compared to non-primary braces, i.e., wrist and ankle braces, because primary braces resulted in higher reimbursements.  ROMANOWSKI and Co-Conspirator 1 incentivized Empire's employees with cash, prizes, and commissions tied to the number of braces the employees "sold" to the Beneficiaries.

c. Many of the Beneficiaries were elderly, and Empire's employees used various strategies to get the Beneficiaries to agree to receive DME, including asking compound or confusing questions.  Some Beneficiaries were called multiple

11

times by Empire employees.

    d.  ROMANOWSKI and Co-Conspirator 1 received Beneficiary complaints, including from the children of elderly Beneficiaries who complained that the Beneficiaries were receiving too many phone calls and that the Beneficiaries did not need the braces that were sent to them.

    e.  ROMANOWSKI and Empire sent information about the Beneficiaries, including the edited call recordings and pre-written DME orders, to RediDoc, which then arranged for the DME orders to be signed by a doctor whom RediDoc was paying on a per-order basis. The doctors paid by RediDoc often signed DME orders without ever speaking to the patient, much less establishing a doctor-patient relationship with the patient.

    f.  Once RediDoc's doctors had signed the orders regardless of medical necessity, Empire then steered them to DME suppliers around the country for fulfillment.

    g.  After the DME suppliers dispensed the DME and were reimbursed by health care benefit programs, the DME suppliers sent a portion of the reimbursement amount as a kickback to Empire.

  In violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

1. The allegations in Counts 1 and 2 of this Information are realleged here for the purpose of alleging forfeiture.

2. Upon conviction of one or both of the Federal health care offenses (as defined in 18 U.S.C. § 24) alleged in Counts 1 and 2 of this Information, ROMANOWSKI shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, ROMANOWSKI obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense, the aggregate value of which totaled approximately $5,519,219, and which includes, but is not limited to, the following property:

   a. All funds on deposit in JPMorgan Chase account no. XXXXX2579, held in the name of Platinum Funding Associates, LLC (approximately $639,573.86);

   b. All funds on deposit in JPMorgan Chase account no. XXXXX3192, held in the name of Platinum Funding Associates, LLC (approximately $125,874.22);

   c. One 2015 Ferrari Berlinetta, VIN ZFF74UFA7F0209644;

   d. One 2018 BMW X6, VIN 5YMKW8C53J0Y74493;

   e. One 2019 Lamborghini Huracán, VIN ZHWUC2ZF0KLA11393;

   f. One 2018 Dodge Caravan, VIN 2C4RDGCG0JR268292;

   g. One 2018 Dodge Caravan, VIN 2C4RDGEG0JR223866;

   h. One 2018 Dodge Caravan, VIN 2C4RDGCG4JR267145;

   i. All funds and other property held or managed by Caxton Alternative Management A/K/A CAM Capital in the name of, or for the benefit of Nicco Romanowski, or any entity owned, managed, or controlled, in whole or in part, by Nicco Romanowski, including but not limited to Platinum Funding Associates, LLC, in any and all investments, loan transactions, dividends, and returns on investment; and

    j. Any and all interest held by, in the name of, or for the benefit of Nicco Romanowski, or any entity owned, managed, or controlled, in whole or in part, by Nicco Romanowski, including but not limited to Platinum Funding Associates, LLC, in any and all investments, loan transactions, dividends, and returns on investment, in the following:

       i. TVT Capital LLC;

      ii. C6 Capital, LLC;

     iii. ACH Capital LLC;

     iv. Worldwide Capital Management, Inc.;

      v. Lendtek Capital Funding, LLC a/k/a Lendtek;

     vi. Stacked Capital;

     vii. Broad Street Capital Group;

    viii. Lilogy; and

     ix. Kalamata Capital Group LLC.

    k. All property traceable to the property described in paragraphs 2(a)-(j) above.

## SUBSTITUTE ASSETS PROVISION

3. If any of the above-described forfeitable property, as a result of any act or omission by ROMANOWSKI:

    a) cannot be located upon the exercise of due diligence;

    b) has been transferred or sold to, or deposited with, a third party;

    c) has been placed beyond the jurisdiction of the court;

    d) has been substantially diminished in value; or

    e) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated

by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

*Vikas Khanna/by LMC*
VIKAS KHANNA
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

CASE NUMBER: 23-

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

v.

**NICCO ROMANOWSKI**

# INFORMATION FOR
18 U.S.C. § 371
18 U.S.C. § 1349

**VIKAS KHANNA**
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515
NEWARK, NEW JERSEY

KATHERINE M. ROMANO
ASSISTANT U.S. ATTORNEY
(973) 353-6095